1  TERRI KEYSER-COOPER
   Law Office of Terri Keyser-Cooper
2  NV Bar #3984
   2395 Viejo Place, Lake Havasu City, AZ 86406
3  125 Edgewater Parkway, Reno, NV 89519
   Tele (775) 337-0323
4  keysercooper@lawyer.com
   *Attorney for Plaintiff Johnson*

5

6

7                  **UNITED STATES DISTRICT COURT**

8                       **DISTRICT OF NEVADA**

9
   HIRAM JOHNSON,                        Case No.
10
          Plaintiff,                     COMPLAINT
11
            v.                           Jury Demand- Disparate Treatment Claim
12                                       Bench Trial- Disparate Impact Claim

13 DAL GLOBAL SERVICES, LLC,
   aka DELTA GLOBAL SERVICES,
14
          Defendant.
15
   _____/
16
                    **JURISDICTION AND VENUE**
17

18      1.      This Court has jurisdiction of this employment failure to promote case pursuant to 42

19 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 2000e-2(k)(1)(A)(i); and 28 U.S.C. Sections 1331, 1343, 2201.

20      2.      Venue is proper in the Northern District of Nevada pursuant to 28 U.S.C. Section

21 1391(b) because the unlawful acts and practices alleged herein occurred in Northern Nevada, which

22 is within this judicial district.

23
                              **PARTIES**
24

25      3.      Plaintiff Hiram Johnson ("Johnson" or "Plaintiff") is an African-American male, a

26 veteran of the United States Army, and a citizen of the United States residing in Sparks, Nevada.

27 Plaintiff is currently employed at DAL GLOBAL SERVICES, LLC aka Delta Global Services.

28

                                                                                              1

Plaintiff has filed a charge of discrimination with the Nevada Equal Rights Commission and received his right to sue letter. Plaintiff timely files his Complaint.

4.      Defendant is GLOBAL SERVICES, LLC ("Defendant") doing business as Delta Global Services, at the Reno-Tahoe International Airport in Reno, Nevada.

5.      Plaintiff alleges Title VII of the Civil Rights Act applies to Defendant and imposes upon Defendant the general rule that no employer may discriminate against an employee on the basis of his or her race.

6.      Plaintiff alleges that Defendant and/or its agents, employees, and servants performed, participated in, aided and/or abetted in some manner the acts averred herein, which proximately caused Johnson further alleges that Defendant ratified, approved, delegated, and authorized all actions of its agents, employees, and servants.

**FACTUAL ALLEGATIONS**

**Johnson's Background**

7.      Johnson is a Vietnam War veteran who saw active military combat in Vietnam. Johnson was diagnosed with Post Traumatic Stress Disorder as a result of his military experience, earning him a 70 percent disability rating.

8.      At the time Johnson was hired by Defendant he possessed a high school education, a bachelor's degree in Business Management and a master's degree in Business Administration and Management from Grand Canyon University, Phoenix, Arizona.

9.      The bulk of Johnson's prior work experience, approximately 40 plus years, was with the United States Postal Service ("USPS") where he had an exemplary and highly distinguished career, rising through the ranks to become a senior plant manager supervising over 300 employees at the distribution center in Reno, Nevada, earning a salary of $106,000.00, plus benefits.

1
2
3
4
5
6

10.     Johnson started at the USPS at the Mail Processing Center in Phoenix, Arizona in 1971 as a collector and special delivery clerk. Johnson was first promoted to supervisor of mail processing in 1977, where he worked as a letter sorting machine. He was responsible for supervising 25 employees processing 60 letter per minutes. Johnson and his crew were recognized for high achievement and accuracy.

7
8
9
10
11
12
13

11.     In 1980 Johnson was promoted to General Supervisor, a mid-level management position. Johnson and other supervisors were responsible for over 200 employees assigned to the letter sorting machines on the night shift. Johnson was responsible for eleven letter sorting machines processing mail for station carrier routes. Johnson and his subordinates received many awards and recognition for high performance in productivity and accuracy and earning "spot awards" for performance.

14
15
16
17
18
19
20
21
22

12.     Johnson was also assigned to bring new equipment into the Phoenix General Processing Distribution Center. Johnson remained a supervisor along with a supervisorial team responsible for approximately 200 employees. Johnson was responsible for setting up the machines and interfacing the new machines with the USPS sorting systems. Johnson was responsible for moving sacks of mail from manual processing to operation by mechanized operations. The utilization of these machines saved the USPS many work hours. During the Christmas seasons, Johnson was responsible for converting the sack sorting machines into parcel sorting machines to process the very high volumes of parcels.

23
24
25
26
27
28

13.     In 1985 Johnson was assigned to facilitate the introduction of automation of letter mail. Johnson was assigned to work with the Automation Operation Optical Charter Reader and assist in achieving the goal of moving the processing of letter mail from mechanized operation to automation operations thus reducing the need for manpower to process mail. Johnson remained a

3

general supervisor. The mechanized operation staffing needed to process mail under the old system was seventeen employees. The staffing needed for the Optical Charter Reader was two employees. Johnson's work achieved the goal of moving 85 percent of letter mail into automation operations at the Phoenix facility.

14.     In 2003 Johnson was recognized by the Area Vice President of the Pacific Area of the USPS as an outstanding employee and assigned to a special detail team to increase Priority Mail Service goals. Johnson was assigned to be "team leader" for one of the Area Standardization Sorting Enhancement Teams working with other teams in the Pacific area. Johnson was responsible for supervising six supervisors as part of the team effort. With the teams working together, the USPS was able to standardize the processing of Priority Mail in all the process and distribution centers in the Pacific Area. Johnson and his team were able to achieve the highest Priority Mail scores in the USPS. Because of Johnson's work, he was selected to a higher level detail as Plant Manager in Reno, Nevada, Fresno, California, and Bakersfield, California. After Johnson was detailed to these three locations, service and productivity increased substantially for the USPS.

15.     In October 2005, Johnson was promoted to Senior Processing and Distribution Center Plant Manager of Reno, Nevada. During his tenure as Senior Plant Manager Johnson was responsible for a work force in Reno of 350 employees. His work enabled and encouraged employees to be self-starters and achievers in all aspects of processing the mail through the Reno plant, thus achieving many production performance awards and many service achievement awards for increasing productive, reducing accident rate, and increasing morale in employee. Johnson also introduced the Small Parcel and Bundle Sorting machine and the Flat Sorting Machine thus increasing mail flow to cities, stations, and associate offices for Northern Nevada and the California 961 zip codes.

16.     Johnson retired from the USPS on May 2, 2013. At the time of Johnson's retirement, he was earning $106,000.00 plus benefits.

17.     After retirement, Johnson was hired by Walgreens, in Sparks, Nevada, as a clerk. He also trained new employees and handling difficult customers on a part time basis. Johnson left Walgreens to take employment with Defendant.

**Johnson Is Hired By Defendant**

18.     On April 30, 2018, Johnson was hired by Defendant at a rate of $11.00 per hour as a "ramp agent."

19.     In September 2018, Johnson earned his "below wing" certification with Defendant.

20.     In September 2018, Johnson earned his "above wing" certification with Defendant.

21.     From October 2018 to the present, Johnson's duties have been primarily aircraft fueling, reconciling daily and weekly fuel usage as well as monthly fuel usage for a report to the corporate fueling department. These reporting responsibilities were the responsibility of the previous supervisor, Tyler Clark, who was transferred to another location. Johnson stepped in when requested to assume Mr. Clark's prior responsibilities.

22.     From October 2018 to the present, Johnson has also worked as a planeside Agent-in-Charge with responsibility to ensure all baggage and cargo are loaded correctly in the plane to remain safe and damage free.

23.     From September 2019 to the present, Johnson has worked in Payload Distribution, responsible for the Load Distribution Desk. This position is responsible to ensure all commodities are accurately reported and provide instruction for proper commodity separation to ultimately ensure aircraft are properly balanced for aircraft and passenger safety and pilots are able to properly control the aircraft.

24.     From September 2019 to the present Johnson also worked to fill in as "group leader" and assist in training new hires in job duties and safety measures.

25.     Johnson has been recognized by Defendant for his professionalism in handling customer concerns.

26.     Johnson has received only positive feedback on his job performance. Johnson has never received written or verbal reprimands or discipline.

**Johnson Applies for Promotion For Passenger Service Supervisor**

27.     On or about October 15, 2018, Johnson applied for promotion to Passenger Service Supervisor. The duties of such a supervisor include supervising and assigning duties to agents, performing passenger and ramp services and ensuring services are performed at the ticket counter, gates and ramp. At the time of the interview, Johnson possess these qualifications.

28.     Johnson was qualified for the position and performed well in the interview. Johnson received positive feedback from his interviewers.

29.     Johnson's photograph was taken by then station manager Tammy Mack, one of Johnson's interviewers. Ms. Mack told Johnson that she would be sending his photo to Regional Manager, Colin Herrington, out of the area, and "let him know that you were the **right person** for the position" and confirmed "he was selected for promotion." Mr. Herrington's approval was a necessary prerequisite to Johnson's promotion to Passenger Service Supervisor.

30.     A photograph would make it immediately obvious to Mr. Herrington that Johnson was African-American.

31.     Through the next several weeks Johnson inquired of Ms. Mack whether he had been "approved" as the new supervisor. Ms. Mack told Johnson she had "not heard."

32.     In late December, 2018, Johnson received an email from Human Resources stating

1
2

he was not selected for the position. Ms. Mack, in response to Johnson's question, said Johnson had "misunderstood" the email and was in fact the top contender for the position.

3
4
5
6
7
8
9

33.     On or about January 2019, Johnson learned from Aaron Sprinkle, a brand new employee, that Mr. Sprinkle had been promoted to the position of Passenger Service Supervisor. It is believed and alleged that Mr. Sprinkle, who is Caucasian, was far less qualified in every respect than Johnson at the time he was promoted over Johnson. It is believed and alleged that Mr. Sprinkle was hired "off the street" to be supervisor with no prior aviation experience. It is also believed and alleged that Mr. Sprinkle possessed less education and less supervisory experience than Johnson.

10
11

34.     Johnson was required to train Mr. Sprinkle in his duties. It is further believed and alleged that within scant months Mr. Sprinkle was fired for violating company policies.

12
13
14
15
16

35.     Miguel Navarro, a former employee of Defendant, heard Mr. Sprinkle, discuss with other supervisors, all White, that he had been specifically hired by Mr. Herrington to "clean up the blacks, the Mexicans, and the Tongans." The White supervisors said nothing to Mr. Sprinkle about his racists remarks or objected to the remarks, as if they accepted the remarks as reasonable.

17
18

36.     It is believed and alleged that the far less qualified Mr. Sprinkle was intentionally hired over Johnson because Mr. Sprinkle is White and Mr. Johnson is Black.

19
20

### Johnson Applies For Promotion To Performance Supervisor

21
22
23
24

37.     On or about December 2018, Johnson applied for promotion to Performance Supervisor. Human Resources informed Johnson that his application was received and he would be interviewed for the position. Johnson waited for Acting Manager Beverly Jacobson, a White woman, to notify him of the date and time for the interview.

25
26
27

38.     On January 29, 2019, Johnson had a dentist appointment with the Veteran's Administration for 3:00 p.m. Johnson had made the appointment months in advance, scheduling it,

28

as he did all his appointments, for his regular day off. All dental and doctor appointments at the Veteran's Administration require long months of waiting.

39.    Defendant changed Johnson's work schedule. While Defendant had the right to change Johnson's work schedule, this meant his dental appointment was now scheduled for a day he was to be at work.

40.    Johnson notified Supervisor Chris Pruett of his planned absence by text exchange: Johnson texted: "Chris, I'll be late to work Tuesday because I have a doctor's appointment at 3:15, this appointment was scheduled before the new schedule was made and I must make all VA appointments. Thanks, Hiram."

41.    Supervisor Pruett approved Johnson's planned absence with a reply text: "All good."

42.    Johnson texted Supervisor Pruett back, thanking him for approving his brief absence. The text from Pruett firmly establishes that Defendant had notice Johnson had a medical appointment and approved the short absence.

43.    Johnson reported to work at 4:08 p.m. on January 29, 2019, immediately following his dental appointment. Johnson was scheduled to be at work at 3:00 p.m., and was at work approximately **one hour later** than his scheduled time due to his pre-approved dental appointment.

### Johnson Denied Interview

44.    When Johnson reported to work Ms. Jacobson told him: "You called out today." Johnson explained that he had a pre-approved dental appointed authorized by Supervisor Pruett. Ms. Jacobson told Johnson, "You were to be interviewed today!" Johnson had received **no prior notice** that interviews were to be conducted that day. Johnson was only absent slightly over one hour and his brief absence had been approved by his supervisor.

45.     On information and belief there is nothing that would have prevented Ms. Jacobson

from verifying with Mr. Pruett that Johnson had a preapproved absence. There is nothing that would have prevented her from interviewing Johnson that day. There is nothing that would have prevented her from arranging an alternative time for Johnson's interview.

46.    Johnson had no way to know that interviews were to be conducted that day because he was never advised that interviews would be conducted that day.

47.    Ms. Jacobson then informed Johnson the "plane is here" thus terminating their brief discussion. By stating the "plane is here" Ms. Jacobson was signaling their conversation was over, Johnson had to immediately "get to work" and there would be no further discussion. Following Johnson's work with the plane he immediately sought out Ms. Jacobson to discuss his interview but she had left for the day. The next day, January 30, 2019, was Johnson's regular day off.

48.    On January 31, 2019, Johnson spoke to Ms. Jacobson asking when his interview would be scheduled. Ms. Jacobson responded that the interviews were complete. Johnson asked why he did not get an interview. Ms. Jacobson responded: "Well, I have completed my interviews and made my selection." Ms. Jacobson refused to allow Johnson to interview for the position.

49.    Defendant represents itself in its handbook as an "equal opportunity employer." Defendant states it recognizes the value in diversity and acknowledges that diversity as a key to the success of the organization. "At DGS, we believe in treating everyone with dignity and respect and is firmly committed to a policy of equal opportunity for all personnel." If Ms. Jacobson wanted to live up to Defendant's alleged adherence to equal opportunity, she could have provided advance notice of the interviews, allowed Johnson an opportunity to be interviewed, and considered him fairly along with other applicants." Further, Ms. Jacobson demonstrated that she could not even be bothered talking to Supervisor Pruett to learn that Johnson actually had preapproval for his short absence or that the medical appointment had been made months in advance on Johnson's regularly

scheduled day off. Instead, Ms. Jacobson shut Johnson out, refused to allow him to be interviewed, and refused him notice of the interview. In  conducting herself in such an unfair and biased manner, Ms. Jacobson behaved in direct opposition to Defendant's handbook and demonstrated intentional discrimination in violation of state and federal civil rights laws.

50.     Shortly thereafter Johnson learned that Adam Holguin was selected for the position of Performance Supervisor. It is believed and alleged that Mr. Holguin, who is White, was far less qualified in every respect than Johnson at the time Mr. Holguin was promoted over Johnson. It is believed and alleged that Mr. Holguin was a childhood friend of Supervisor Pruett. It is believed and alleged that Mr. Holguin was hired "off the street" to be supervisor with no prior aviation experience, less education, and far less supervisory experience than Johnson. Johnson was required to train Mr. Holguin in his duties. It is believed and alleged that Mr. Holguin has been terminated for violating company policy.

51.     It is believed and alleged that the far less qualified White Adam Hogui was hired over Johnson because Mr. Hoguin is White and Mr. Johnson is Black and as a result of intentional discrimination.

**Johnson Complains of Discrimination to Regional Manager**

52.     On or about February 8, 2019, Johnson contacted by telephone Eric Shockley, an out of the area regional manager. Johnson asked Mr. Shockley why he had not been selected for promotion. Johnson explained he believed he was the superior candidate and believed he had been discriminated against on the basis of race. Mr. Shockley promised to "get back" to Johnson in a few days. Mr. Shockley did not get back to Johnson. Mr. Shockley ignored Johnson, again ignoring Defendant's highly touted words in its handbook regarding the value it places on diversity and its recognition that diversity as a key to the success of the organization.

53.     In speaking to Mr. Shockley, Johnson followed company policy. Johnson was not required to bring his concerns of racial discrimination to the Human Resources Department. Defendant's employee handbook provides that employees who believe they have been subjected to discriminatory conduct should promptly speak to, write, or otherwise contact their supervisor or "any other member of management' as one of three alternative routes to bringing a discrimination complaint.

54.     On or about February 19, 2019, following Mr. Shockley's failure to "get back" to Johnson as promised, Johnson contacted Mr. Shockley again. Mr. Shockley explained that Johnson had not been selected for promotion by Ms. Jacobsen because he was "unreliable" and "undependable." Mr. Shockley explained that Ms. Jacobson had relayed to him that Johnson was "not what she was looking for in a supervisor" because he had failed to report to work as required. Johnson explained he had never been advised of the interviews, never provided with notice, and he had pre-approval for a brief dental appointment on the day in question and had arrived at work immediately after his dental appointment. Further, Johnson explained he had a "**perfect**" attendance record. Johnson told Mr. Shockley he had never once been late or absent and requested that Mr. Shockley pull his attendance records and verify that he was indeed extremely reliable, dependable, and always on time. Johnson explained he had received preapproval for his one dental visit and he had missed slightly more than one hour with full approval from Supervisor Pruett.

55.     Johnson also requested that Mr. Shockley compare his attendance with the attendance records of anyone at the company to prove and establish his reliability and dependability. Johnson explained he had been a supervisor for decades with the USPS and never heard of someone not getting advance notice of an interview for a higher level position and believed he was being discriminated against on the basis of race.

56.     Mr. Shockley refused to pull Johnson's attendance records, insisting Johnson was an unreliable, undependable employee and Ms. Jacobson was correct in failing to provide notice of the interview and correct in concluding he was unreliable and undependable.

57.     Johnson states on information and belief Defendant has a record of hiring White people for supervisorial positions. Throughout 2018-2019, Whites were and continue to be regularly promoted to supervisorial positions.

## Johnson Files Complaint With NERC

58.     On April 9, 2019, Johnson filed a complaint with the Nevada Equal Rights Commission ("NERC").

59.     On May 30, 2019, Johnson signed his Charge of Discrimination with NERC.

60.     On June 9, 2020, Defendant position on Johnson's Charge of Discrimination was received by Johnson. Defendant denied the allegations of discrimination. Defendant maintained it promoted individuals whom they believed to be the most qualified candidates. Defendant stated it hired an individual they viewed as having aviation experience and leadership skills which would be valuable. Defendant explained Johnson was not hired for the second position because he failed to report to work on the date that the interviews were to be conducted (failing to explain to NERC that Johnson had not been given prior notice of the interviews or that Johnson had prior preapproval for one hour off he took for a dental appointment). Further, Defendant falsely stated that Johnson failed to report the discrimination issue to Eric Shockley. Johnson timely responded to these false statements made by Defendant.

## NERC Finds For Johnson -- Probable Cause For Violation of Failure To Promote

61.     On July 12, 2021, NERC issued its determination. NERC concluded that "probable cause" exists for a violation of failure to promote based on age and race. NERC wrote:

The Commission finds PROBABLE CAUSE for a violation of failure to promote

based on race and age.

Evidence showed that CP (Charging party, here Johnson) was the most qualified candidate amongst Respondent's selection pool and yet, in both attempts to promote; and in both interviews, CP was passed over in favor of younger persons, with less experience and not of CP's race.

Furthermore, credible witness evidence supported allegations that management was aware of unwelcome, harassing comments based on race amongst employees, yet nothing was done to prevent offensive comments relating to race and ethnicity.

Evidence showed that CP was a qualified candidate for management, having earned a bachelor's degree and a master's degree in Business Administration with continuous employment for the United States Post Office for over three decades and a good worker for Respondent.

Comparatively, Respondent selected two candidates despite CP's consecutive attempts to promote; one of the candidates holding a high school diploma with team lead experience at a bank; the other successful candidate was a manager at a restaurant. The Commission found no evidence of poor work performance of CP, rather evidence showed that CP was an efficient worker, one witness questioning why CP had not been selected.

62.     NERC held that Defendant's reason for not promoting Johnson for the position of `performance Supervisor was "pretextual."

63.     NERC stated, "the totality of the evidence suggests Respondent failed to adhere to an EEO environment."

## FIRST CAUSE OF ACTION

### Failure To Promote Based on Disparate Treatment-A Violation of Title VII

64.     Johnson realleges and incorporates by reference herein the allegations above contained.

65.     Johnson alleges intentional discrimination, a bias against a Black candidate for promotional opportunities.

66.     Johnson belongs to a protected class, African-American, he applied for the position of "Passenger Service Supervisor" and "Performance Supervisor" and was qualified for both

13

promotional positions. Johnson had a reasonable expectation of being promoted and was told, as to the position of "Passenger Service Supervisor" that he was the "right person for the job." Johnson was denied both promotions while White persons, outside the protected class, with lesser qualifications, lesser leadership experience, lesser supervisorial experience, and no aviation experience, were selected. Johnson alleges he was required to train both White supervisors in how to do their jobs.

67.     Johnson alleges he was rejected despite his superior qualifications and job performance. The individuals selected, outside the protected group, were both lesser qualified. Both White individuals were given an unfair advantage in the hiring process, and promoted in an irregular and discriminatory fashion.

68.     Defendant has failed to state a legitimate nondiscriminatory reason for selecting lesser qualified White candidates. The reasons provided by Defendant are factually related to prohibited bias and counter to an appropriate EEO environment.

69.     Defendant has stated a false and pretextual reason for its failure to promote Johnson, reasons illogical, inconsistent, and actually untrue. Johnson was the superior candidate in both attempts at promotion. Johnson's qualifications were so superior to the credentials of the persons selected that no reasonable person in the exercise of impartial judgment could have chosen the candidate selected over Johnson for either of the supervisor positions available.

70.     Defendant insisted that the lesser qualified White Mr. Sprinkle was a superior candidate for the position of Passenger Service Supervisor when any reasonable assessment would reveal that Mr. Sprinkle had less education, less supervisory experience, and no aviation experience as he was hired directly off the street. Johnson and others were required to train Mr. Sprinkle in how to do his job. Further, Johnson had all but been promised the promotion by the person interviewing

him for the position. It was only after a photograph was taken of Johnson, and provided to out-of-the-area Mr. Herrington, that Johnson was notified he would not be selected. Finally, Mr. Sprinkle was known to make racist statements against Blacks, Mexicans, and Tongans in the presents of other supervisors and who represented in front of a witness while talking to other supervisors that he was directed by Defendant's management to rid the environment of "Blacks, Mexicans, and Tongans."

71.     As for the promotion of White Mr. Holguin, Defendant insisted that it had no obligation to notify Johnson of the date and time that interviews would be conducted for the "Performance Supervisor" position and insisted that Johnson would not be selected because he was undependable and unreliable because he was at a preapproved dental appointment when the surprise interviews were conducted. Defendant refused to provide Johnson with an interview and refused to review Johnson's attendance records which would clearly have indicated that Johnson was extremely dependable and reliable, having never once been late, absent, or taken a sick day.

72.     Further, it was widely known and acknowledged with Defendant's work environment that White Mr. Holguin was a childhood friend of White supervisor Chris Pruett. Defendant insisted that the selection of Mr. Holguin was the correct selection despite his having less education, less supervisory experience, and no prior aviation experience.

73.     As a direct and proximate result of the aforedescribed unlawful and malicious conduct by Defendant, plaintiff suffered economic loss, grievous bodily harm and emotional distress.

74.     As a direct and proximate result of Defendant's actions and disregard for Johnson's rights to be free from discriminatory conduct based on race, Johnson has suffered damages including lost pay, lost benefits, the indignity of discrimination, the invasion of the right to be free from discrimination, and great humiliation which is and was manifest in emotional distress, outrage, severe

1  anxiety about his future, damage to his reputation, disruption of his personal life, and loss of enjoyment

2  of the ordinary pleasures of everyday life.

3
   75.      As a direct and proximate result of Defendant's actions, Johnson has suffered far more

4
   emotionally than any other candidate would likely suffer as his longstanding PTSD, brought on by
5

6  serving active duty in Vietnam, has been affected.

7      76.      As a direct and proximate result of Defendant's actions evincing intentional

8  discrimination with malice or reckless indifference to Plaintiff's federally protected rights of an

9  aggrieved individual, Plaintiff is entitled to a finding of punitive damages.

10                              **SECOND CAUSE OF ACTION**

11          **Failure To Promote Based on Disparate Impact-A Violation of Title VII**

12     72. Johnson realleges and incorporates by reference herein the allegations above contained.

13
   73. Disparate impact claims involve employment practices that are facially neutral in their
14

15  treatment of different groups but that in fact fall more harshly on one group than another and cannot

16  be justified by business necessity.

17     74. A facially neutral employment practice may be deemed illegally discriminatory without

18  evidence of the employer's subjective intent to discriminate that is required in a "disparate

19
   treatment case." Congress allows claims to be brought against an employer who uses a practice that
20
   causes disparate impact, whatever the employer's motives.
21

22     75. Johnson, upon being told by his interviewer for the Passenger Service Supervisor, that he

23  was the "right person" and would be "promoted" he was also told his photograph had to be taken

24  and sent to Regional Manager Colin Herrington. The photograph clearly depicted Johnson as a

25  Black male.

26     76. There is no legitimate nondiscriminatory reason for taking Johnson's photograph as a

27  condition precedent to his promotion. The sole purpose to be served by the taking of the photograph
28

is to show what Johnson looks like. The photograph makes clear Johnson is Black and his racial identity has no relevance to his promotional suitability.

77. While the act of photographing employees who are potential candidates for promotion is factually neutral, it has a discriminatory impact because it allows the decisionmaker, who has not interviewed the person, to see what the person looks like and to reject him on that basis. The practice is in reality a sham designed to conceal discriminatory motive. Johnson's photograph provided no meaningful information from which Mr. Herrington could learn whether Johnson was the best candidate for the promotion.

78. As a direct and proximate result of Defendant's actions and disregard for Johnson's rights to be free from discriminatory conduct based on race, Johnson respectfully requests all equitable relief possible and understands he has no right to a jury trial on this issue.

## **RELIEF REQUESTED**

WHEREFORE, plaintiff prays for judgment against Defendants as follows:

(a)     For declaratory relief;

(b)     For equitable relief;

(c)     For compensatory damages from Defendants in an amount to be determined at trial relating to plaintiff's Title VII disparate treatment claim;

(d)     For economic damages including past, present and future lost earnings and related economic damages;

(e)     For punitive damages;

(f)     For attorneys' fees and costs incurred herein;

(g)     For leave to amend this complaint should the same become necessary;

(h)     For such other and further relief as this Court may deem appropriate.

Dated:  This 6th day of October, 2021

/s/ Terri Keyser-Cooper
TERRI KEYSER-COOPER
*Attorney for Hiram Johnson*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28